***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all times relevant to this claim.
3. This is a claim in which plaintiff alleges that she became disabled on or about February 8, 2003, as a result of an occupational disease.
4. Plaintiff underwent right knee surgery by Dr. Flanagan on April 30, 2003.
5. Following her right knee surgery, plaintiff returned to work on or about July 28, 2003.
6. Plaintiff was taken back out of work by Dr. Flanagan on September 2, 2003.
7. Plaintiff returned to work on or about September 18, 2003, and is currently working for defendant-employer.
8. The parties stipulated to the following exhibits:
(a) Plaintiff's medical records;
 (b) Plaintiff's employment files from Kelly Springfield Tire Company;
 (c) Plaintiff's Kelly Spring Tire Company's medical records;
(d) Plaintiff's Army National Guard records; and
(f) The Industrial Commission forms in this claim.
9. The parties entered into a Stipulated Consent Protective Order, which was approved by Deputy Commissioner Ronnie E. Rowell on March 17, 2004, and which provided for David Brodie, a certified ergonomist, to enter upon the premises of defendant-employer's plant/facility in Fayetteville, North Carolina, to inspect, through observation, measurement, and videotaping the actual performance of the re-roll, bias cutter, and liner pickup jobs. The Stipulated Consent Protective Order also gave defendants the right to have a certified ergonomist of their choosing present during this inspection. On April 26, 2004, David Brodie conducted an ergonomic analysis of the re-roll, bias cutter, and liner pickup jobs and he was accompanied by Blake McGowen, a certified ergonomist chosen by the defendants.
10. Following the hearing before the Deputy Commissioner, the parties agreed to stipulate to an average weekly wage of $1,053.08, which would mean that on the date of alleged disability, plaintiff would have been entitled to the maximum compensation rate for 2003, $674.00.
11. The issues before the Commission are:
 (a) Is plaintiff's right knee condition a compensable occupational disease under the North Carolina Workers' Compensation Act;
 (b) If so, to what benefits is plaintiff entitled under the North Carolina Workers' Compensation Act for her right knee condition; and
 (c) If plaintiff is found entitled to indemnity benefits, do defendants get a credit for disability benefits paid and, if so, in what amount?
 *********** EVIDENTIARY RULINGS
The objections raised in the deposition of Dr. James Flanagan are OVERRULED.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty years of age. Plaintiff started working for defendant-employer in 1997, and was still employed there at the time of hearing before the Deputy Commissioner. From 1993 to 1997, she had been employed by Black and Decker. The plaintiff was in the military on active duty between 1981 and 1986, and then the reserves from 1986 through 2001.
2. Plaintiff worked twelve-hour shifts when she began working for defendant-employer, but switched during November 2001 to eight-hour shifts, six days a week.
3. From 1997 to May 2001, plaintiff's job at defendant-employer entailed working in Re-Roll Repair and Pick-up Liners. Generally, plaintiff would work on Re-Roll Repair for three days, and then would be rotated to Pick-up Liners for three days. In May 2001, plaintiff began working as a Bias Cutter Operator.
4. Re-roll Repair involves re-rolling the fabric liner that is used to separate the rubber that is used to make tires. The fabric liner is re-rolled on a machine. The worker operates two re-roll machines. The average level of production is between 250 and 300 liners per 8-hour shift. Each liner weighs approximately 45 pounds. The worker retrieves from a flatbed truck the roll of liner to be re-rolled, carries the roll of liner to the re-roll machine, and slides the roll onto a spindle on the re-roll machine. When the liner has been re-rolled, the worker slides it off the spindle, carries the re-rolled liner to another flatbed, and stacks it on the flatbed.
5. Plaintiff testified that because she does not have a lot of upper body strength, she would use her lower body for strength, momentum, and support in order to lift and carry the rolls of liner. Plaintiff is right-hand dominant, so she would rely on the right side of her lower body to hoist the rolls of liner on and off of the flatbeds. The rolls of liner are stacked on the flatbeds at a height of between 17 and 45 inches above the floor. Plaintiff is approximately 65 inches tall. Therefore, plaintiff had to bend her knee in order to get down to the level of the liner and then lift the roll of liner. This placed stress on plaintiff's patellofemeral joint. On average, the Re-roll Repair operator performs between 500 and 600 lifts per shift.
6. Plaintiff's other job duty in Pick-up Liners involves retrieving fabric liners from shelves around the tire room and loading the liners onto a flatbed. In an eight-hour shift, the average worker loads between 600 and 700 liners. In doing this job, plaintiff would drive her flatbed to each area where liners needed to be picked up. She would step down off the truck, walk over to the shelves, lift each liner off of a shelf and onto the right side of her body, carry each liner over to the flatbed, place each liner on the flatbed, and then step back onto the truck when she had finished loading all of the liners at that location. The liners to be picked up weight approximately 45 pounds each. The liners are retrieved from a shelf that is 54 inches high. When stacked two-high, the reach to the liner is 70 inches from the floor. The design of the flatbed cart results in liners being lowered to a height of 14 inches from the ground for the bottom row of liners, or being lifted to a maximum height of 60 inches from the ground for the top row of liners.
7. Plaintiff testified she would use her right leg to help her hoist each liner onto the flatbed. Further, taking the liners from a higher level on the shelves and bringing them down to a lower level onto the flatbed would require plaintiff to bend her right knee.
8. Prior to the time of the hearing before the Deputy Commissioner, plaintiff made a motion to permit a certified ergonomist, David Brodie, to enter the premises and videotape plaintiff's jobs. That Deputy Commissioner allowed the motion. However, at the hearing, the plaintiff testified that the video was not accurate in that she performed the job differently than the video revealed. Because it is not a true representation of the way in which plaintiff performed her job, the Full Commission gives little weight to the video.
9. Plaintiff began to experience right knee pain and swelling in July 1998, while she was working in the Re-roll Repair and Pick-up Liners job. Dr. Izurieta, a physician at defendant-employer's dispensary, ordered an x-ray. The x-ray was normal; however, due to her right knee pain and swelling, plaintiff was placed on modified work for ten days with a restriction against prolonged standing and walking.
10. Plaintiff had never had any right knee problems prior to working for defendant-employer. She did have a prior injury to her left knee, which occurred on April 15, 1995, when her left knee was clipped by a car while she was walking. Plaintiff suffered a contusion of her left knee, but it healed well and gave her no further problems.
11. In October 2000, plaintiff filed a claim for disability benefits with the Department of Veterans Affairs. Plaintiff's claim was for right thumb and right knee problems. At the time she filed her claim, plaintiff had not been told that her right knee problem could have been caused by repetitive use at work; however, she had been told that she could have arthritis in her right knee and had assumed that it started while she was in the military. The military granted plaintiff's claim for a service-related thumb injury, but denied her claim for a service-related knee condition.
12. On April 10, 2001, plaintiff visited her family care practice and she was seen by Nurse Practitioner Susan Lewis. Plaintiff reported increased weakness in the right side of her body, including a tremor with the use of her right hand. Susan Lewis referred plaintiff to Dr. Sanpath Charya, a neurologist, for evaluation.
13. Plaintiff was first examined by Dr. Charya on May 1, 2001. She reported recurrent episodes of right-sided weakness, jerking, dropping objects with her right hand, right leg give-away, head tremors, dysesthetic discomfort, neck discomfort, occasional visual floating spots, and occasional dizzy spells. Dr. Charya referred plaintiff for testing procedures and assigned light-duty restrictions. Dr. Charya did not write plaintiff out of work.
14. Plaintiff transferred from working in Re-roll Repair and Pick-up Liners to working as a Bias Cutter Operator in May 2001. The Bias Cutter Operator stands at a conveyor belt, guiding rubber onto the conveyor and operating two foot pedals and a knee bar. The force required to activate the padded portion of the knee bar is ten pounds. The knee bar is activated by the worker approximately once every thirty seconds. The knee bar is used to slow the machine down in order to give the operator a chance to catch up with the rubber that is coming down the cute and onto the conveyor belt. Plaintiff testified that she primarily used her right knee to operate the knee bar because of the way in which she twisted her body to the left while guiding the rubber down and onto the conveyor belt.
15. Plaintiff's right knee did not stop bothering her when she transferred to the Bias Cutter Operator job in May 2001. On October 18, 2001, plaintiff's family doctor noted that she had right knee pain with palpation. In November 2001, plaintiff returned to defendant-employer's dispensary complaining of right knee pain, which she felt might be due to her job.
16. In December 2002, plaintiff returned to her family doctor's office with right knee pain and swelling. At that time, it was noted that plaintiff's left knee was also starting to bother her, due to having to compensate for her right knee problems by putting more weight on her left knee. Plaintiff underwent an ultrasound, which showed a Baker's cyst (an accumulation of synovial fluid) on her right knee.
17. In January 2003, plaintiff again presented to defendant-employer's dispensary with right knee swelling. On January 14, 2003, plaintiff's right knee pain was evaluated by Dr. James Flanagan at the request of her family doctor. Dr. Flanagan ordered an MRI, which showed that plaintiff had chondromalacia patella, a softening of the knee cartilage. Chondromalacia patella can develop either as a result of repetitive damage to the cartilage or as a result of a significant event, such as a direct blow to the kneecap. Activities involving repetitive bending of the knee are associated with the development of chondromalacia patella, especially when those activities also involve lifting or carrying heavy items. The Full Commission notes that plaintiff's work in Re-roll 
Repair and Pick-up Liners for defendant-employer, involved bending of her right knee while lifting, carrying, and lowering 45-pound liners. Additionally, plaintiff's work as a Bias Cutter Operator for defendant-employer involved impact on or around her right knee.
18. Plaintiff underwent surgery on her right knee on April 30, 2003. On June 10, 2003, Dr. Flanagan re-evaluated plaintiff had noted that she remained unable to work at that time. On that date, Dr. Flanagan also discussed with plaintiff the cause her right knee condition.
Dr. Flanagan is generally familiar with the type of work that is done at defendant-employer's plant. Additionally, Dr. Flanagan reviewed the ergonomic evaluations of each of the three jobs performed by plaintiff for defendant-employer.
19. Dr. Flanagan was of the opinion, and the Full Commission so finds, that the physical requirements of plaintiff's work at defendant-employer placed her at an increased risk for developing chondromalacia patella, an occupational disease, as compared with members of the general public who are not equally exposed. Dr. Flanagan further opined, and the Full Commission finds as fact, that plaintiff's work for defendant-employer made a significant contribution to, and was one of the causes of, her right knee chondromalacia patella. The repetitive damage to the knee cartilage caused by frequent bending of her right knee while lifting, carrying and lowering 45-pound liners was one of the causes. Another cause was striking the pedal with her right kneecap every 30 seconds when she was doing the Bias Cutter Operator job.
20. Following her right knee surgery, Dr. Flanagan released plaintiff to return to work as of July 28, 2003. Plaintiff returned to work on that date in the Re-roll position.
21. On September 2, 2003, Dr. Flanagan took plaintiff back out of work due to increasing pain and marked swelling in her right knee. Plaintiff returned to work for defendant-employer on September 18, 2003.
22. During the time in which plaintiff was out of work for her right knee condition, she was paid Sickness Accident benefits in the amount of $375.00 per week, before taxes. These benefits were pursuant to an employer-funded disability plan.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's right knee chondromalacia patella is due to causes and conditions characteristic of and peculiar to her employment with defendant-employer, and is not an ordinary disease of life to which the general public not so employed is equally exposed, and, thus, is an occupational disease. N.C. Gen. Stat. § 97-53(13); Rutledge v. TultexCorp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).
2. Plaintiff is entitled to receive temporary total disability compensation at the weekly rate of $674.00 per week from April 8, 2003 to July 28, 2003, and from September 2, 2003, to September 18, 2003. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to medical compensation for all related medical expenses incurred, or to be incurred, as a result of her right knee chondromalacia patella for so long as such treatment is reasonably necessary to effect a cure, give relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
4. Defendants are entitled to an appropriate credit for any compensation paid to plaintiff pursuant to an employer-funded disability plan during the periods in which plaintiff was awarded disability compensation herein. Here an appropriate credit is 75% of the Sickness Accident benefits. Palmer vs. Jackson, 579 S.E.2d 903 (2003); N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the weekly rate of $674.00 per week from April 8, 2003 through July 28, 2003, and from September 2, 2003, through September 18, 2003, subject to the credit and attorney's fee provided herein. Because this amount has accrued, it shall be paid to plaintiff in a lump sum.
2. Defendants shall provide to plaintiff medical compensation for all related medical expenses incurred, or to be incurred, as a result of her right knee chondromalacia patella for so long as such treatment is reasonably necessary to effect a cure, give relief, or lessen the period of disability.
3. Defendants shall pay directly to plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff herein, before defendants' credit. Because this fee is based upon compensation that has accrued, it shall be paid to plaintiff's counsel in a lump sum.
4. Defendants shall be credited 75% of any compensation paid to plaintiff pursuant to an employer-funded disability plan during the periods in which plaintiff was awarded disability compensation herein. The credit is reduced from 100% to 75% so that plaintiff's attorney will be afforded, at least partially, a proper fee for the work required.
5. Defendants shall pay the costs, including expert witness fees to Nurse Practitioner Susan Lewis and Dr. James T. Flanagan, if not paid by prior order. Defendants are also responsible for the cost of the ergonomic evaluation performed by ergonomist David Brodie.
This 10th day of October 2005.
 S/ ______________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/ ______________________ BUCK LATTIMORE CHAIRMAN
 S/ ______________________ CHRISTOPHER SCOTT COMMISSIONER